**FOREST PARK LANES, LTD., et al.,**
**Appellants,**

v.

**Charles F. KEITH et al., Appellees.**

**No. 17015.**

Court of Civil Appeals of Texas.

Fort Worth.

May 2, 1969.

Rehearing Denied June 6, 1969.

Hudson, Keltner, Smith & Cunningham, and Joe Bruce Cunningham, Fort Worth, for appellants, Forest Park Lanes, Ltd., Forest Park Shopping Center, Ltd., Aaron Rashti, and George Rashti.

Garrett & Nation, and John Garrett, Fort Worth, for appellant Jack E. Turnbow.

Rawlings, Sayers & Scurlock, and Nelson Scurlock, Fort Worth, for appellees Charles F. Keith and wife, Opal Keith.

Richard U. Simon, Fort Worth, for appellee Broben, Inc. d/b/a Ol' South Pancake House.

Hudson, Keltner, Smith & Cunningham, and Joe Bruce Cunningham, Fort Worth, for appellees, Forest Park Shopping Center, Ltd., Aaron Rashti and Abe Rashti.

Donald C. Bubar, Fort Worth, for appellee Tandy Leather Co.

## OPINION

MASSEY, Chief Justice.

### STATEMENT OF THE NATURE AND RESULT OF THE SUIT

This was a suit filed by plaintiffs, Charles F. Keith and wife, Opal Keith, to cancel a long term lease that they had executed as lessors in 1958, and also to recover certain rentals, taxes and attorney's fees which they claimed to be due. The defendants were Forest Park Lanes, Inc., Forest Park Lanes, Ltd., Forest Park Shopping Center, Ltd., Aaron Rashti, George Rashti and Jack E. Turnbow. Intervenors were Tandy Leather Company of Texas and Broben, Inc., a corporation doing business under the name of Ol' South Pancake House.

In addition to denying the claims of plaintiffs, defendants Forest Park Lanes, Ltd., Forest Park Shopping Center, Ltd., Aaron Rashti and George Rashti filed a counterclaim against plaintiffs and also a cross-action against the other defendants. The case was tried to a jury beginning on February 19, 1968 and on February 28, 1968, the trial court on its own motion withdrew the case from the jury, except as to certain damages, and the jury returned a verdict finding in response to the only four special issues submitted as follows:

1. That the amount of $3,894.00 was a reasonable monthly rental of the property in question for the period from June 1, 1966 to May 1, 1967, inclusive. (In so answering the jury was instructed that it was to assume that tenant or tenants would pay all ad valorem taxes against the property.)

2. That the amount of $18,700.00 was a reasonable attorney's fee for the services of plaintiffs' attorneys "in representing the plaintiffs in this suit."

3. That the amount of $2,500.00 would be a reasonable attorney's fee for the services of Tandy Leather Company's attorneys in representing them in this suit.

4. That the amount of $8,500.00 would be a reasonable attorney's fee for the services of Jack Turnbow's attorneys in defending the action brought against him by plaintiffs.

Following the jury verdict, defendants Forest Park Lanes, Ltd., Forest Park Shopping Center, Ltd., Aaron Rashti and George Rashti filed a Motion for Judgment, a Motion that the findings of the jury be disregarded and a Motion for Judgment Non Obstante Veredicto. These motions were overruled on June 12, 1968 and on that date, the trial court entered judgment providing as follows:

1. That the plaintiffs recover possession of the property described in the Lease Agreement and that their title be quieted and adjudged to be free and clear of any cloud arising from any and all claims of any of the defendants.

2. That plaintiffs recover of and from Tandy Leather Company of Texas the sum of $4,812.00 with interest and that they also recover the sum of $10,332.00 which had been paid into the registry of the Court by Tandy Leather Company of Texas.

3. That the balance of $2,500.00 paid into the registry of the Court by Tandy Leather Company of Texas be paid to the attorneys for Tandy Leather Company of Texas.

4. That plaintiffs recover from Broben, Inc., a corporation doing business as Ol'

South Pancake House, the sum of $2,443.50 plus interest and also that they recover the sum of $17,104.50 paid into the registry of the Court by Broben, Inc.

5. That the plaintiffs recover of and from Forest Park Lanes, Inc., Forest Park Lanes, Ltd., Aaron Rashti, George Rashti and Jack Turnbow, jointly and severally, the sum of $59,175.51 and that they recover the sum of $7,591.94 paid into the registry of the Court by defendants.

6. That plaintiffs recover of and from defendants, Forest Park Lanes, Ltd., Aaron Rashti, George Rashti and Jack Turnbow, jointly and severally, the sum of $128,243.67 with interest.

7. That defendants, Jack Turnbow, Aaron Rashti, George Rashti and Forest Park Lanes, Ltd., recover judgment against Forest Park Lanes, Inc. for $59,175.51.

8. That the Lease Agreement entered into by Tandy Leather Company of Texas and Forest Park Shopping Center, Ltd. be fully terminated as of June 1, 1967.

All other relief sought by all parties was denied. All relief sought by plaintiffs in their pleadings was granted and in general all relief sought by defendants against plaintiffs and the other defendants was denied. From such judgment Aaron Rashti, Forest Park Lanes, Ltd., George Rashti, Jack Turnbow, and Forest Park Shopping Center, Ltd. have appealed.

Judgment is reformed by reduction of damages and deletion of attorney's fees, and, as so reformed, affirmed.

## THE PARTIES

In order to try to simplify the statements hereafter, Charles F. Keith and Opal Keith will be referred to as "Plaintiffs"; Forest Park Lanes, Ltd., Forest Park Shopping Center, Ltd., Aaron Rashti and George Rashti will be referred to as "Defendants"; Forest Park Lanes, Inc. will be referred to by its full name; Jack Turnbow will be referred to as "Turnbow";

Tandy Leather Company of Texas will be referred to as "Tandy"; and Broben, Inc., doing business as Ol' South Pancake House will be referred to as "Pancake House".

(It should be pointed out also that Forest Park Lanes, Inc., which did not appeal, did not appear through counsel or otherwise at the trial and all judgments taken against it were essentially default judgments, although the judgment does not so recite. Likewise, the Pancake House did not appear and participate at the trial.)

Where reference is made to defendants, it will include only the defendants above mentioned, i. e., excluding Forest Park Lanes, Inc., Tandy, Pancake House, and (except inferentially in instances where his interest and contentions are substantially identical with those we have designated "defendants") the defendant Turnbow. Except as to the cross-action filed by Turnbow against defendants, the interest of the defendants and Turnbow is essentially the same.

Defendants filed an original and Amended Motion for New Trial based upon which they perfected appeal. The same is true as to Turnbow, who separately participates, and on the appeal he complains not only of the relief granted plaintiffs, but because he was not granted relief of contractual indemnity by way of his cross-action against Forest Park Shopping Center, Ltd., Aaron Rashti and Abe Rashti, as its general partners.

## SITUATION PRELIMINARY TO DISPUTE

The fact situation of the case is complicated. We will outline in this preliminary statement the circumstances resulting in the litigation.

In 1944, plaintiffs purchased approximately 30 acres in Trinity Park just east of what is now known as University Drive in the City of Fort Worth. Following the purchase of the land, the plaintiffs used this land for the operation of

a driving range, an amusement park and leased a portion of it out to various tenants including a nursery.

On December 24, 1958, plaintiffs leased a portion of this property to Aaron Rashti. This lease is the basic controversy in this lawsuit and the lease was introduced in evidence as plaintiffs' Exhibit 1. The property covered thereby is shown on a plat attached to the lease. There are three tracts, Tract "A", Tract "B" and Tract "C". The basic lease covered Tract "A" and gave options as to Tract "B" and Tract "C". The option as to Tract "B" was exercised but was not exercised as to Tract "C". Generally, the bowling alley that was constructed was built on Tract "A" and the Pancake House building was built on Tract "B".

There are many important provisions to the lease but we will specifically call attention to several. Paragraph IV obligated the lessee, Aaron Rashti, to erect upon the premises a building for the operation of a bowling alley of 32 lanes or more, a restaurant and a shopping center. The lessee was obligated to start the building not later than April 15, 1959 and to complete the building within six months or else pay a rental even though the building be still under construction. Within nine months or as soon as the bowling alley building be completed, the lessee was obligated to pay a minimum monthly rental in the amount of $500.00. In addition to this minimum monthly rental, the lessee was obligated to pay five percent (5%) of the gross receipts, less the minimum monthly rental. Also in the event lessee should elect to sublet, he would then be required to pay to lessor five percent of any rent derived as result of subletting or subleasing. Paragraph VI obligated lessee to pay all of the ad valorem taxes assessed against the property beginning with the year 1959, although it does not specify when they should be paid. Paragraph VII concerned the options with regard to Tracts "B" and "C" and, as originally stated, the option was exercised as to Tract "B" but

not as to Tract "C". Such paragraph provided that the rental to be paid on Tract "B" was $200.00 per month. Paragraph XV gave the lessee the right to assign the lease or to sublet the premises. The lease was for a primary term of 20 years. Paragraph XVII thereof gave the lessee the option to renew the lease for two additional 20 year periods so that the term might be said to have been for 60 years, if the two option periods be considered as included.

Aaron Rashti formed a limited partnership, Forest Park Lanes, Ltd. (under provisions of Vernon's Ann.Tex.St., Art. 6132a, "Uniform Limited Partnership Act") for the purpose of building the bowling alley required by the Primary Lease. He assigned the lease to Forest Park Lanes, Ltd. Besides Aaron Rashti the general partners were George Rashti and Jack Turnbow. Construction on the bowling alley began in June, 1959 and was completed on November 18, 1959. Jack Turnbow was the contractor. He built the building at cost with his profit taken in the form of the amount of his stated contribution as a general partner in Forest Park Lanes, Ltd.

The original building had an open area down on the ground floor which was not completed. The bowling alley, which was completed, was on the second floor. The original building had concrete piers which were dug to 50 feet and the architect on the job, Morris Parker, testified that the building had a reasonable life expectancy of 100 years. The total amount spent on the original building by Forest Park Lanes, Ltd. was $497,904.18. In addition, Forest Park Lanes, Ltd. purchased bowling equipment at a cost of $514,348.68. In order to finance the construction of this building, Forest Park Lanes, Ltd. borrowed $175,000.00 from Southwestern Financial Corporation and executed a deed of trust to secure the payment of this note. The note was signed by each of the general partners of Forest Park Lanes,

Ltd., namely Aaron Rashti, Jack Turnbow and George Rashti.

Forest Park Lanes, Ltd. had used all of of the funds contributed by general and special partners to complete the main building. In order for it to complete the bottom part of the building, for use as a shopping center, it was necessary that additional funds be secured. The limited partnership agreement provided that none of the partners would be required to make additional contributions, so a letter was sent to all of the partners of Forest Park Lanes, Ltd. to determine if they did want to participate in the building of the bottom floor. Not all of the partners did wish to contribute. It was decided that a new limited partnership would be created in order to raise this additional capital and those who wanted to could come into the new partnership.

Consequently, on May 2, 1960, a sublease was entered into whereby Forest Park Lanes, Ltd. subleased to Aaron Rashti the property where the Pancake House building was constructed and also the ground floor of the bowling alley building. This lease was for a term of 10 years with options to renew for an additional 50 years. It provided for a rental of $1,250.-00 per month, with an increase to $1,500.00 per month after the first 10 year period. At the time thereof the plaintiffs were given a copy of the sublease and were given the right to exercise their option to take the sublease themselves, and they refused, whereupon the transaction with the new limited partnership was consummated.

The new limited partnership, formed for the purpose of making these additional improvements, was Forest Park Shopping Center, Ltd. The only general partner was Abe Rashti. The property on which these improvements were to be located was covered by the sublease from Forest Park Lanes, Ltd. to Aaron Rashti. Aaron Rashti assigned all his right, title and interest in and to this sublease to Forest Park Shopping Center, Ltd. Forest Park Shopping Center, Ltd. completed the downstairs portion of the building which was occupied by Tandy at the time of trial and also built the building occupied by the Pancake House at the time of trial, at a total cost to it of $172,605.00.

The ground floor or downstairs of the main building was leased to Tandy and this lease provided for a rental of $1,604.00 per month. The separate building, known as the Pancake House, was leased to George H. McArthur who later assigned to the Pancake House. The rental due to be paid by the Pancake House under this lease was $814.50 per month.

Although it had subleased the property on which the Pancake House was constructed and the lower floor of the bowling alley building, Forest Park Lanes, Ltd. continued as the owner of the Primary Lease until February 1, 1963. On February 1, 1963, Forest Park Lane, Ltd. assigned its rights under the Primary Lease to Forest Park Lanes, Inc., which assumed, as between the parties, the duty to discharge the liability and duties thereunder. Walter Banfield was the owner of Forest Park Lanes, Inc., or one of the owners, and it was he who subsequently handled its affairs.

Generally, what is stated is demonstrative of the title situation at the time trouble started in December, 1965. While the above may sound complicated, it can be easily summarized. Forest Park Lanes, Inc. (Banfield) was the owner of the Primary Lease and was obligated to perform all of its provisions (including the payment of taxes) and to pay all the rentals provided for in the Primary Lease to the plaintiffs. Out of the Primary Lease had been carved by a sublease a subleasehold estate consisting of the Pancake House and the lower floor of the bowling alley building. Forest Park Shopping Center, Ltd. (by an agreement of sublease from Aaron Rashti, who had the right to sublease from Forest Park Lanes, Ltd.) was the owner of this subleasehold estate. Under its agreement it was obligated to pay rentals in the

amount of $1,250.00 per month to Forest Park Lanes, Inc. Pancake House was a sublessee under this subleasehold estate and was obligated to pay rental to Forest Park Shopping Center, Ltd. in the amount of $814.50 each month, and Tandy was also a sublessee under this subleasehold estate and was obligated to pay to Forest Park Shopping Center, Ltd. a monthly rental in the amount of $1,604.00 per month.

## PARTIAL SUMMARY JUDGMENT

Reference is made to the $175,000.00 borrowed by Forest Park Lanes, Ltd. to finance building construction. It is to be remembered that such limited partnership was the sublessee of Aaron Rashti. By permission and agreement on the part of plaintiffs a first mortgage lien was placed against their fee simple interest, and though they were not individually obligated by the note the Deed of Trust securing the note of Forest Park Lanes, Ltd. pledged their interest in the property as security. Through transfers and assignments not necessary to be noticed the Farm and Home Savings Association owned and held the note and Deed of Trust on and prior to March 28, 1967. On said date, by consummated sale and purchase agreement with plaintiffs, there was assignment and transfer thereof to them for the full balance owing thereon of $111,484.49. At that time the monthly installment payment on the note, due March 1, 1967, in the amount of $1,548.59, was past due and unpaid. In the instrument of assignment it was recited that: "the transferees, Charles F. Keith and his wife, Opal Keith, have declared that there is no intention on their part to effect a merger of their interest in the property heretofore owned by them with the leasehold estate described in said deed of trust."

It is to be observed that the intervening interest in the property, between that of the plaintiffs and of Forest Park Lanes, Ltd., a limited partnership, was that of Aaron Rashti. By purchase of the note was effected a liability thereon to plaintiffs by Forest Park Lanes, Ltd., but no liability on the part of Aaron Rashti, as such individual, was necessarily effected so that he became liable thereon (without regard to any limitation of liability). In other words it was as a general partner in Forest Park Lanes, Ltd. that his liability obtained.

In making the purchase no merger of plaintiffs' estates was intended to be accomplished. Obvious to the circumstances of the instant case is the fact that any intent on the part of the plaintiffs to effect a merger would be contrary to their interests, and that was true at time of the assignment on March 28, 1967. 22 Tex. Jur.2d, pp. 656–7, "Estates", Sec. 16, "(Merger of estates)—Intention of owner as controlling", and Sec. 17, "—Presumption that intention corresponds to interest".

By Trustee's Sale on May 2, 1967 plaintiffs foreclosed their deed of trust lien against the property. At the sale plaintiffs bid for and purchased the property for the the sum of $5,000.00. The deficiency owing on the note by Forest Park Lanes, Ltd., after crediting the amount realized at Trustee's Sale, was the total of $128,243.67, inclusive of principal, interest and the attorney's fee as provided in the note.

Both the assignment from Farm and Home Savings Association, and the Trustee's Sale occurred subsequent to the time plaintiffs had initiated their suit against the defendants. Their suit had been filed July 12, 1966, nearly a year earlier. The objective sought to be accomplished by the suit was to obtain a judgment, effect of which would be to declare that as of June 4, 1966 the original lease from them to Aaron Rashti was properly declared at an end (as terminated according to contractual provisions) along with all rights under subleases thereupon dependent, and for damages equivalent to reasonable rental during the subsequent period while the premises were withheld from plaintiffs. The form of their suit was that of a Trespass to Try Title case.

It was while said case was slowly grinding through the "judicial mill" that plaintiffs took steps to obtain and foreclose the mortgage against Forest Park Lanes, Ltd. Occasion therefor was well stated in a letter of the trial court found in the transcript, viz: "The defendants argue that plaintiffs by asserting a termination of the lease had them over a barrel where they could not risk making payments on the Farm & Home loan, but it is equally obvious that the defendants had the plaintiffs in the same uncomfortable position where they could not risk failing to make the payments on the loan. Apparently realizing that they might not be subrogated for their payments so made and might be classed as volunteer payors, the plaintiffs chose to purchase the note and place themselves in the position of Farm & Home."

A month after the foreclosure by Trustee's Sale a fire occurred at the premises in question. Apparently there were policies purchased by plaintiffs following foreclosure and policies presumably still in effect theretofore purchased by Forest Park Lanes, Ltd., or in its behalf. Due to the dispute existent all insurance companies have denied or withheld payment pending the settlement of the dispute between the parties.

Believing themselves entitled to possession of the premises, or at least to a portion thereof, on the strength of their foreclosure by Trustee's Sale, plaintiffs filed a motion for summary judgment on June 19, 1967. On October 18, 1967, they obtained a partial summary judgment. Provisions thereof were to the effect that "there was no irregularity which would impair the validity of the foreclosure proceeding, whereby the plaintiffs acquired title to the leasehold estate under the terms of a warranty deed dated May 2, 1967, executed by Joe H. Eidson, Jr., as substitute trustee." By the summary judgment title was quieted in plaintiffs as to the leasehold estate of Forest Park Lanes, Ltd., and the general partners thereof. As result, the subsequent trial of the merits of the controversy remaining was conducted with any and all issues removed therefrom upon the matter of propriety and effectiveness of the plaintiffs' foreclosure under the Deed of Trust. Such was not true of the liability plaintiffs sought to impose by their suit on the resultant note deficiency obligation of Forest Park Lanes, Ltd., and the general partners thereof. Liability therefor was a part of the litigation upon the merits.

On appeal there are points of error which attack the propriety of said partial summary judgment. Citing our recent statement in LaGrone v. Wesco-Wamix, Inc., 433 S.W.2d 525 (Fort Worth Tex.Civ. App., 1968, writ ref., n. r. e.) where we held that a movant had the burden of showing that defendants could not produce evidence to make out a *prima facie* case on the facts alleged as a defense to the cause of action of plaintiff movants, the interested defendants before us insist that such was the burden of plaintiffs in this case. We agree. As we view the position of the parties, relative to the issue of such propriety, plaintiffs would be deemed in the position of a defendant who seeks to show that a plaintiff has no evidence which would create an issue of fact (as to the validity of foreclosure proceedings upon his property) entitling him to a jury trial, and/or that the circumstances were such that defendant could not introduce proof sufficient to invoke the court's equity jurisdiction that the matter of equities as between the parties (plead by defendants) must be deferred to the time of trial of the merits. This, we hold, was proved by the plaintiffs' evidence before the trial court on the proceedings for summary judgment. There was no error in the granting of plaintiffs' motion to the extent allowed by the summary adjudication.

For purposes of test of propriety of summary judgment we may assume that inadequacy of consideration is made apparent in the $5,000.00 purchase at the Trustee's Sale. However, mere inadequacy of consideration alone and in and of itself does not render a foreclosure sale void if

the sale was legally and fairly made. Tarrant Savings Association v. Lucky Homes, Inc., 390 S.W.2d 473 (Tex.Sup., 1965). There must, in addition, be evidence to show that the foreclosure was otherwise irregular or unfair before inadequacy of consideration would become a factor. Absence of such was *prima facie* established by the plaintiffs' evidence on Motion for Summary Judgment. Thereby the burden of going forward was shifted to defendants if they were to avoid plaintiffs' entitlement to judgment on the showing made.

■ Defendants contend that we should declare that they had shown an absence of plaintiffs' right to such summary judgment because of their evidence—coupled with evidence raising the issue of inadequacy of consideration—that they were deceived as result of not having been afforded actual (as distinguished from constructive) notice of the Trustee's Sale, and that the deception was operative to their prejudice in that it caused them to refrain from protecting themselves. Defendants cite the case of Cline v. Cline, 323 S.W.2d 276, 284 (Houston Tex.Civ.App., 1959, writ ref., n. r. e.) as authority to such effect. However, in that case it was shown that the mortgagor was willing and able to pay, and would have paid the note and stopped the sale had she had actual notice; plus other circumstances relative to what could have been and would have been done to stop the sale or to avoid the adverse effects flowing therefrom upon the interest of the mortgagor. In the instant case nothing similar is shown. Because nothing is shown we believe and hold that nothing was made to appear as a reason for avoiding the consequences of the Trustee's Sale other than an inadequacy in price. That, as already stated, would be insufficient reason to interfere.

The partial summary judgment was properly granted.

## THE NOTE INDEBTEDNESS

Proceeding to the case on the merits, it follows that the balance owing upon the note, as principal, interest, and attorney's fees was an amount to which plaintiffs were entitled to judgment unless some credit was demonstrated applicable in a reduction of the balance owing upon the indebtedness thereof. None was shown so any question thereof became a matter of law for the court. It was thus treated.

As of date of the foreclosure under the Deed of Trust the indebtedness, after credit of the $5,000.00 received on the sale, was $128,243.67.

## THE LEASE TERMINATION

Of importance in this connection is the fact that the original lease obligated Aaron Rashti to pay all ad valorem taxes "when due". In the event of a failure in discharge of such an obligation discovered to be in default, upon notice given plus 60 days in which to cure complaint which was subject of the notice, it was contractually provided that there would be an automatic termination of the primary lease. It was also provided that all improvements located on the property when the lease ceased—as terminated—would become the property of the plaintiffs. There was a failure of compliance in that some 1965 State and County taxes were not paid "when due"; a written notice thereof as provided; and a failure to correct the condition of default for a period of 60 days after date of the notice.

Under the specific provisions of contract between plaintiffs and Aaron Rashti we are convinced that the primary lease to the latter might have been treated as one terminated as a matter of law on or about May 1, 1966. Since upon said date, and thereafter possession of the premises continued as before the fact that plaintiffs, through their attorney, selected a later date of termination in no way prejudiced plaintiffs' rights relative to the provisions. They selected the date of June 3, 1966, when their attorney wrote a letter to Aaron Rashti stating, "Inasmuch as you have failed to cure the default referred to above within sixty days after notice, Mr. Keith has elected to exercise his right under the

contract to terminate the lease." Neither may the defendants claim any benefit because of the fact that the court, pursuant to its judgment and decree, used the termination date of June 3, 1966. Defendants elected to take the position before the trial court and on appeal that there was and should have been no termination in that there was no breach on their part resulting in the plaintiffs' right to terminate the lease. Such election inhibits the defendants' contention that because the wrong date was selected by plaintiffs they were entitled to defeat the forfeiture which was decreed.

It is apparent from the provisions of the lease that the clause relative to termination provided to plaintiffs and no other persons the rights relative thereto. As such they were subject to "waiver" by them at their option. The result was that though plaintiffs had the right to treat the lease as forfeited as of May 1, 1966 they were at liberty to yield the immediate right and treat the landlord-tenant relationship under the lease as persistent for such period thereafter as they might choose. No prejudice therein accrued to defendants. Likewise there was no prejudice of plaintiffs' right to declare their election to terminate. This we consider fundamental law not requiring citation of authority.

Furthermore, it is established in the record, beyond any doubt, that statutory ad valorem taxes on the subject property were not paid "when due", and for such a period after they became due that they had become delinquent. Proper construction of V.A. T.S., Title 122, "Taxation", Art. 7336, "Penalty", sub. (b), requires the holding that ad valorem taxes are "due" between November 30th of the earlier year and January 31 of the succeeding year, and are "delinquent" if not paid prior to February 1 of the year next succeeding that for which they are to be paid. If such taxes are "delinquent" it necessarily means that they have not been paid "when due". Such being the case as to the taxes on the subject property for the year 1965, they were not paid "when due" and had become "delinquent".

We repeat our observation that the provisions of the primary lease contract of the parties were that plaintiffs, upon giving written notice to Aaron Rashti of the fact that neither he—nor anyone for him—had paid such taxes "when due", there would be initiated the provisions relative to termination of their contract; that should Aaron Rashti or someone for him fail to cure the default by paying the taxes in question within the period of sixty (60) days after delivery of such written notice the lease contract would be terminated as of the end of the last day of said period.

The defendants have founded theories of defense upon contention that the written notice for which the contract of the parties made provision was not dispatched to the proper mailing address. We find from the record that such notice was mailed to the proper person and address. Furthermore the evidence is not disputed to the effect that Aaron Rashti was in receipt of the notice for a period in excess of sixty (60) days prior to June 3, 1966, when plaintiffs declared in writing that the lease was terminated.

We have no doubt, therefore, that the lease was properly judicially declared to have been forfeited as of June 3, 1966, unless the defendants and Turnbow may be said to have made out such a *prima facie* case under principles of equity as to entitle them to a submission of such case following the conclusion of their evidence.

RIGHT TO EQUITABLE RELIEF

There is no doubt but that plaintiffs were enriched as the result of the termination of the lease. Under the contractual provisions all the improvements erected on the property, at no expense to plaintiffs, became a part of their fee simple estate. Of such enrichment, however, the matter of whether it was just or unjust presents

another question. Plaintiffs' gain appears —in our discussion to this point—as one resultant from contingencies concerning which the parties had contracted. Under contract law the courts are obliged to honor and enforce contracts of parties, for the parties' freedom to contract as they choose necessarily requires that they be held bound by the provisions of any contract they choose to make. Nothing in the law inhibits the making or enforcement of the character of contract the parties made.

We are convinced that defendants did not evidence any right to equitable relief against termination of the lease and its forfeiture, or inject any proof into the record which made a fact issue upon the existence of such right.

■ The duty of Aaron Rashti under the primary lease to pay the taxes "when due" was one which he sought to transfer pursuant to the contract he made with Forest Park Lanes, Ltd.; and it, in turn, pursuant to its contract with Forest Park Lanes, Inc. The legal consequence was that Aaron Rashti made Forest Park Lanes, Ltd. his agent for the purpose of paying such taxes "when due",—and that with Aaron Rashti's knowledge and consent Forest Park Lanes, Ltd. made of Forest Park Lanes, Inc. its sub-agent for the same purpose. In consequence thereof Aaron Rashti ratified the agency, as for himself and for Forest Park Lanes, Ltd., of Forest Park Lanes, Inc.'s action or inaction in respect to the payment of taxes "when due". Upon Forest Park Lanes, Inc. having brought to its attention the letter of plaintiffs, dated March 2, 1966, giving notification that State and County taxes due upon the subject property were delinquent and pointing out that failing a cure of such default in the original lease contract the lease provided that at the expiration of a sixty-day period the lease would terminate, that corporation employed the services of an attorney to act as its agent in connection with removing the indicated default. Of course it is essential to the conduct of the business of corporations that their action be by agents. The attorney is not among those who were counsel before the trial court, or before this court on appeal.

Under the circumstances the attorney whose services were enlisted to cure the plaintiffs' aforementioned objection and complaint had the status of an agent for a principal, who was an agent for another principal, who—in turn—was the agent for Aaron Rashti, who by contract with plaintiffs was in duty bound to pay said taxes "when due". Under these circumstances Aaron Rashti would be bound by knowledge in the premises possessed by the attorney, i. e., if said attorney knew at any particular time that the taxes remained unpaid then by operation of law—through the chain of agency relationships culminating in Rashti as the ultimate principal—Aaron Rashti would be chargeable as a matter of law with the same knowledge. The same would apply to the intermediate parties. Restatement of the Law, Agency, Ch. 8, "Notice Through Agent", Sec. 275, "Agent Having Duty to Reveal Knowledge", and Sec. 282, "Agent Acting Adversely to Principal".

The attorney did not correct the condition of default in the original lease agreement consisting in the non-payment of State and County taxes. He did not pay them, and/or determine that they were paid. Yet, as below shown, he represented to plaintiffs that the taxes had been paid, and this representation was made in the material capacity of an agent for a principal, in particular for Forest Park Lanes, Inc., Forest Park Lanes, Ltd., and Aaron Rashti.

On May 4, 1966 the aforementioned attorney wrote to plaintiffs relative to curative action taken upon plaintiffs' complaints. In part the letter read, as follows: "More specifically, the minimum monthly rental of $500.00 due on March 1, 1966, has been paid, and the State and County taxes payable on the leasehold and improvements, which you declared were delinquent and unpaid in said letter, have been paid in full."

In response thereto plaintiffs' attorney wrote on May 6, 1966 and acknowledged

that the rentals had been paid, but stated that he had not checked at the courthouse to see if the taxes had been paid. In such connection his letter read: "I understand that the $500.00 item, which you say was due March 1, has been paid. However, I have not checked at the tax office to determine about the payment of the taxes. No doubt your client has a tax receipt if he has paid them and does not need a letter from Mr. Keith or me."

The fact that these taxes continued to remain unpaid was discovered by the plaintiffs pursuant to an inquiry from the tax assessor-collector at the courthouse after the date of their attorney's letter of May 6, 1966 and prior to date of the same attorney's letter of June 3, 1966. It was by the second of these letters that plaintiffs stated their election to exercise right to terminate the lease.

In view of applicable principles of law Aaron Rashti must be held to have had knowledge as a matter of law on May 4, 1966, that the State and County taxes remained unpaid, contrary to the statement in the attorney's letter of said date, because said attorney's knowledge would be imputed to him as the ultimate principal. The contractual delinquency relative to payment of the taxes, i. e., because of their not having been paid "when due", was established as a matter of law when the contractual provisions are considered along with statutory provisions relative to payment of taxes. Therefore, in view of Texas law, both common and statutory, the failure on the part of Aaron Rashti to pay the taxes could not have been the result of accident or mistake unless there was some "intervening" reprehensible act or omission to act, in violation of duty, on the part of the plaintiffs, during some material period of time.

There could have been no act or omission on the part of the plaintiffs "intervening" between date of plaintiffs' "notice of default" letter on March 2, 1966 and their letter of May 6, 1966, when their attorney stated that he had not checked to "deter-mine about the payment of taxes" which had been represented as paid. Neither Aaron Rashti nor any other defendant was misled in any respect, and plaintiffs, though under no duty anyway, did not possess any knowledge—the revealing or concealing of which could have benefitted any defendant.

There was absolutely no contact between the parties between May 6, 1966, and June 3, 1966, when plaintiffs' attorney wrote the letter amounting to notice of forfeiture. So there would have been no act or omission on the part of plaintiffs during that period. Indeed, that entire period was beyond the 60 day term in which it had at one time been supposed that all matters complained of in the "notice" letter of March 2nd had been corrected.

■ It follows that no issue of fact was raised relative to the defendants' asserted right to equitable relief. As a matter of law there was no accident or mistake on the part of defendants, even apart from a matter of justification, and plaintiffs could not be held to have waived their right to have the lease forfeited through termination or to be estopped through failure on their part to answer letter or letters written to them before May 4, 1966 requesting (additional) information as to elements of the contract as to which plaintiffs asserted default. While there were matters other than the failure to pay taxes "when due" which is the subject of the briefs of the parties, and though statements to the contrary of those here made in a discussion thereof were we to enlarge our discussion and deal with such matters, we are not in doubt of the correctness of what we have stated relative to the matter of default in the lease contract as result of the failure in the payment of taxes "when due".

We deem it immaterial whether at any time the plaintiffs' actions indicated, as is contended, a design on their part to promote the forfeiture of the lease for their own benefit and for defendants' detriment. Even if such had been the true reason for plaintiffs' conduct it would play no part in

the case and would be immaterial unless defendants could be said to have successfully raised a fact issue relative to equitable relief. Our holding is that such an issue was not raised by the evidence in the case and that there was nothing upon which the jury would have been required to determine.

Distinguishable from the period considered in connection with what has been discussed hereinabove is the period following June 3, 1966. This is mentioned because of a contention by the defendants that they have valid defense of "waiver", at least as applied to some of the plaintiffs' money demand, arising as the result of plaintiffs' foreclosure under the deed of trust and sale of the interest of Forest Park Lanes, Ltd. by Trustee's Sale on May 2, 1967. There was no merger of estates which resulted from the transaction. This was discussed at the point in this opinion where the propriety of the partial summary judgment was considered, and reference is made thereto since it might have been better had the writer placed it at this portion of the opinion.

 Defendants contend that the event of foreclosure is inconsistent with plaintiffs' contention that there was lease termination as of June 3, 1966. Demonstrating, defendants point out that if the lease to Aaron Rashti terminated on June 3, 1966 then the rights of all parties would have been terminated so that plaintiffs would have possessed the entire property, with all improvements thereon, from and after that date. With that premise accepted, say the defendants, the foreclosure proceedings would have been pointless and useless in that plaintiffs would be "going through the motions" of acquiring property which was already theirs. Ergo, say defendants, the reason for the Trustee's Sale was because plaintiffs recognized that the lease had not been legally terminated and the transaction was conducted in order to cut off the rights of the defendants to their possession.

Defendants' reasoning is fallacious. Plaintiffs waived nothing as result of the foreclosure and Trustee's Sale. Their lessee was Aaron Rashti. Rashti's sublessee was Forest Park Lanes, Ltd., a co-partnership in which Aaron Rashti had an interest. It was the interest of Forest Park Lanes, Ltd. which was the subject of the foreclosure. Aaron Rashti's interest therein was a minority interest as compared with that of all the other partners collectively. At the time there was pending the plaintiffs' suit to have the lease to Aaron Rashti terminated. The suit was being contested by him and by those succeeding to interests under his primary lease. There was a period of "hold over" by sublessors, and the suit involved the question of whether such was under authority of the primary lease and through the rights thereunder of Aaron Rashti, or otherwise. Under such a situation the plaintiffs could not be said to have made a "waiver", i. e., an intentional or voluntary relinquishment of a known right. Furthermore the defendants could not be heard to contend that right of foreclosure, pursuant to specific contractual provisions in the Deed of Trust, would be or should have been suspended until the title dispute arisen under lease provisions was finally adjudicated. The matter is one as to which defendants will not be heard to complain, nor to assert any advantage because thereof.

We consider settled—by what we have held to this point in our discussion—the fact that the primary lease and all rights thereunder claimed as against the plaintiffs were terminated as of June 3, 1966; that the liability of Forest Park Lanes, Ltd. and the co-partners thereof, separate and apart from that of Aaron Rashti as the individual who was the original lessor, were fixed pursuant to contractual liabilities attendant to the note and the Deed of Trust securing same; and that remaining of ascertainment was the amount owed plaintiffs because of such liabilities—and otherwise owed to plaintiffs in the capacity of landlord because of the retention of their property after June 3, 1966.

However, we are obliged to briefly consider complaints in connection with the conduct of trial.

## THE TRIAL

■ Defendants complain because of a denial of right to introduce evidence from Mr. Keith, one of the plaintiffs, upon the question of whether or not Aaron Rashti could have discovered, by going to the courthouse, whether Keith and a Mr. Banfield (for Forest Park Lanes, Inc.) had made an agreement about taxes altering the written provisions of the lease. A bill of exceptions was taken and an offer of evidence made. Right to introduce such evidence was properly denied. Nothing in the offer of evidence proved anything material to disposition of the case since there was no evidence that any such agreement had been made.

■ Stricken on exception were several paragraphs of the pleadings of the defendants, and of this they make complaint. We hold that there was no error. In part defendants had sought to allege that the plaintiffs had followed a course of conduct with the specific intent to cancel the primary lease and obtain the benefit of the improvements placed thereon by defendants. It is true that a party's motive for doing or not doing a particular act would be material where principles of equity would be involved; that is, as applied to this case, if defendants could make of their case to avoid termination and forfeiture one upon which issues of fact could be made upon equitable grounds. We have held, hereinabove, that principles of equity have no control upon the disposition of the case and that it is controlled under rules of law. Therefore no harm could be said to have been done defendants by the court's ruling on the pleadings.

Stricken upon exceptions, which defendants contend to have amounted merely to general demurrers, were allegations which purported to attack the premise under which the plaintiffs had been granted the summary judgment previously discussed. Of this they complain. We overrule. Everything in connection with the action of the court in said respect is obviated in view of the fact that we have held that the partial summary judgment was properly granted. Necessarily incident to such holding would be a holding that the defendants were not entitled to make a part of their case upon the merits any of the allegations contained in the paragraphs which were stricken.

Also stricken upon exceptions were allegations where defendants sought to take advantage of entitlements, if existent, to proceeds from policies of insurance which were secured by plaintiffs subsequent to June 3, 1966, when, as we have held, the lease was forfeited as terminated. We have also held it to have been proper that the partial summary judgment was granted in affirmance of the validity of the foreclosure under the deed of trust as applied to Forest Park Lanes, Ltd., as of May 2, 1967, when the Trustee's Sale was held.

The insurance policies showed on their face to have been issued on February 22, 1967, with the plaintiffs as named insureds and owners, and with loss clause in favor of Farm and Home Savings Association, as mortgagee. At the time of the ruling upon exceptions, Forest Park Lanes, Ltd. and the co-partners thereof were contesting the plaintiffs' suit to have forfeiture by termination declared. By the sale under foreclosure proceedings the interest in the property of the co-partnership, Forest Park Lanes, Ltd., was eliminated—as we have held in connection with the propriety of the partial summary judgment. It was on or about May 26, 1967 that a fire of unknown origin substantially damaged the improvements located upon the subject premises.

It was defendants' theory that since the plaintiffs had purchased the note and deed of trust the plaintiffs stood in the shoes of Farm and Home Savings Association under the clause protecting it, so that the proceeds of the insurance policies, if any,

would properly be applied to the note of Forest Park Lanes, Ltd. in the reduction of the indebtedness plaintiffs claimed by its suit on the note balance. Such the defendants sought to have judicially established under the Declaratory Judgment Act. Alternatively, defendants claimed that plaintiffs held the policies as agents or trustees for their benefit, so that any sums received from the insurance companies should be applied to the mortgage indebtedness and the excess returned to them.

■ In view of our holding relative to the propriety of the partial summary judgment, and that the trial court correctly held that there was lease forfeiture by termination as of June 3, 1967, no one other than the plaintiffs had standing to claim the benefits from these insurance policies. Defendants had no standing to claim any beneficial interest by and through the rights, if any, of plaintiffs in the policies. Furthermore the provisions of the policies themselves are before the court in such a case as this, and by resort thereto is established the want of any interest in the defendants. Therefore there was no error in the court's action in striking the allegations of defendants' pleading.

In view of our holding relative to the propriety of partial summary judgment, and that the trial court correctly held that there was lease forfeiture by termination as of June 3, 1967, there was no error on the part of the trial court in striking, upon exception, the defendants' allegations that plaintiffs had materially interfered with defendants' possession and use and enjoyment of the premises, and in wrongfully evicting them therefrom. All the acts plead and relied upon by defendants as a premise for the allegations were subsequent to date of June 3, 1967, the date upheld for the lease termination. If the question of liability is properly resolved as a matter of law, as held, the defendants' stricken allegations became wholly immaterial.

## PLAINTIFFS' DAMAGES

We have no doubt of the propriety of the trial court's decision to award damages to plaintiffs and against defendants. However there were elements of the award which we deem erroneous. The first element thereof was the item awarded in the amount of $5,483.91, unpaid city and school taxes for a part of 1965, duty to pay which was the contractual obligation of defendants. The second element was the item of $18,700.00 as plaintiffs' attorney's fee. These will be considered at the latter part of this section of the opinion, following a "schedule" of damages granted.

Without elaboration upon the state of the pleadings and evidence, etc., to support a judgment for to damages in all respects other than as to the items of $5,483.91 and $18,700.00, we will state that we find the record in order, and that it supports the grant thereof. In particular, in said respect the defendants complain of a certain special issue upon which a portion of the grant of damages was founded, as follows:

"Special Issue No. 1.

"What do you find from a preponderance of the evidence was a reasonable monthly rental of the property in question, being both tracts A and B and all improvements thereon, for the period from June 1, 1966 to May 1, 1967, inclusive?

"(You are instructed that in answering the foregoing special issue you will assume that the tenant or tenants using the property will pay all ad valorem taxes assessed against it, * * *)

"Answer: 3,894.00".

■ There is no doubt but that the special issue was submitted in a form which amounted to a comment on the weight of the evidence. The jury was informed that the court was of the opinion that there was a reasonable monthly rental value, and that such rental value was in excess of the amount of those ad valorem taxes cal-

culable on a monthly basis. However, since it is undisputed in the evidence that at material times there were tenants occupying and using the property (their entry was as subtenants), and since it is also likewise obvious that such tenants were paying rentals which amounted to more than the ad valorem taxes, the court's comment on the weight of the evidence became immaterial. Use of the language in both the special issue, and in the instruction given in connection therewith, enabled a simple submission of an ultimate issue, when a more complicated method would have otherwise been required. Thereby the work of the jury on the verdict was rendered more efficient and expedient, without any attendant prejudice resulting to the defendants. No reversible error is apparent because no harm resulted.

For clarification of the discussion to follow upon the matter of improperly allowed elements of damages we copy below, under the label "Schedule", a portion of the judgment of the trial court:

"SCHEDULE

| | | |
|---|---:|---:|
| "Minimum rent of $700 due April 1, 1966, with interest at the rate of 6% per annum to August 15, 1966: | | $ 715.36 |
| "Minimum rent of $700 due May 1, 1966, with interest at the rate of 6% per annum to August 15, 1966: | | 712.19 |
| "5% of the gross receipts ($6,776.67) less the minimum rent of $2,500 for the months of January, 1966, to May, 1966, inclusive: | $4,276.67 | |
| "Interest at the rate of 6% per annum from January 20, 1967: | 352.21 | 4,628.88 |
| "Taxes of State, County and other political subdivisions for the year 1965 paid by the plaintiffs on June 17, 1966: | 3,391.94 | |
| "Interest on the preceding item from June 17, 1966, to August 15, 1966: | 32.89 | 3,424.83 |
| "City and School taxes on the property, both buildings and grounds, for last half of 1965: | | 5,483.91 |
| "Rent at the rate of $1,466.00 per month for the period June, 1966, to April, 1967, inclusive: | | 16,126.00 |
| "City and School taxes for the year 1966: | | 13,427.75 |
| "Taxes of State, County, etc., for the year 1966: | | 3,548.53 |
| "Attorney's Fee: | | 18,700.00 |
| "Total: | | $66,767.45 |

"Of this amount $7,591.94 has been paid into the registry of the court: $6,891.94 on August 15, 1966, by Forest Park Lanes, Inc., and $700.00 on September 16, 1966, by Aaron Rashti and Forest Park Lanes, Ltd., leaving a balance due and owing of $59,-175.51."

Observable on the Schedule are the items of damages considered: $5,483.91

and $18,700.00. They each constituted elements taken into consideration in the trial court's judgment in favor of plaintiffs and against defendants.

The $5,483.91: This amount represented the total of those city and school taxes which the defendants were obligated to pay under contract with plaintiffs for a portion of the taxable year of 1965, but which they did not pay. Of course it was necessary that these taxes be paid, and the plaintiffs paid them to protect their property interests. Plaintiffs were therefore entitled to sue for and recover the amount of $5,483.91 as damages. But in the involved procedure of this complicated case plaintiffs failed to pray for such relief. In a paragraph of the defendants' Amended Motion for New Trial (No. 184) they assigned error because there was a want of pleadings to support award of the item as an element going to make up the whole of the damages.

■ The plaintiffs point out that in their prayer they requested "general relief", and contend that as result of proper consideration of the question it should be held that their pleadings embraced the $5,483.91 and award of such amount was proper. In plaintiffs' prayer they list in six specific paragraphs the items of relief for which they pray, including such by way of awards in money as damages. Everything listed in the Schedule other than as to the item of $5,483.91 related to the relief mentioned in the prayer portion of the pleadings. This item, one not proper to be considered as cast in controversy because *not* "necessarily" involved as a part of some other item of damages sustained, for the recovery of which there was prayer for specific relief, was one which did not fall within the scope of plaintiffs' prayer for general relief. Therefore it must be deleted from the judgment granting it as part of the total of plaintiffs' damage entitlement. It was beyond the authority of the trial court to grant and, since it was called to his attention at a proper time presents remedial matter on appeal. On application of the legal principle requiring that we so hold, see cases cited at 17 Tex. Jur.2d, p. 396, "Damages", Sec. 320, "Interest". We are of the opinion that where the judgment in the instant case represents, in part, damages in excess of those asked in pleadings the excess may be removed so that the ultimate judgment would be for the proper total amount. We therefore do this.

■ The $18,700.00: We likewise hold that the grant of this sum as attorney's fee was improper, though for a different reason. The award thereof was based upon that part of the jury's verdict wherein they found such amount as answer to the inquiry of a Special Issue, reading as follows: "What sum of money, if any, do you find from a preponderance of the evidence would be a reasonable attorney's fee for the services of Plaintiff's attorneys in representing the Plaintiffs in this suit?" Among the objections made by the defendants, brought forward to the trial court by an assignment of error, and by point of error to this court, was that the issue was a comment on the weight of the evidence; that it was not an ultimate issue; and that for the reason that as worded the issue submits to the jury an improper standard of any obligation that the defendants might have to the plaintiffs with regard to attorneys' fees. In part the assignment of error stated: "In this connection, defendants would call to the attention of the Court the wording of the lease agreement itself which provides as follows:

" 'Also, if on account of a default in the payment of rent or taxes or breach of any other condition of .this contract by lessee, it shall become necessary for lessor to employ an attorney to enforce any of the lessor's rights or remedies hereunder, then in such case, any reasonable expenses incurred by lessor in the way of attorneys' fees shall be paid by lessee.' "

Plaintiffs' right to recover attorneys' fees in the instant case should be, in view of the

fact such was contracted for by the parties, according to the provisions of their contract. Submission of the issue upon such fees was not under or in accord with the contractual provisions. When it is recognized that such would have been the appropriate submission it is apparent that the objections made by plaintiffs should have been sustained. It was error to overrule them and we hold that such error amounted to reversible error.

Upon oral presentation of the case before this court the attorney for plaintiffs stated that rather than to have the cause remanded to the trial court in the event we should so hold he would tender remittitur of the attorney's fees if result thereof would be affirmance. Since we have here held that the award thereof was reversible error, we honor the tender of remittitur, orally made, and delete from the total of the damages the item, $18,700.00. So doing is without prejudice to plaintiffs' right to complain of our action and assign it as error to the Supreme Court.

As between plaintiffs and defendants, pursuant to our discussion, hereinabove, we reform the judgment in that we reduce the amount of damages awarded in the trial court by the amount of $24,183.91 ($5,-483.91 plus $18,700.00). As so reformed the judgment is affirmed.

## JACK TURNBOW

■ Covered by what we have written hereinabove would be our holdings as to contentions made by defendant Turnbow, as well as the other parties we term as "defendants", i. e., Aaron Rashti, Forest Park Lanes, Ltd., and Abe Rashti. Thereby we have declared the liabilities of the defendants to the plaintiffs. However, the defendant Turnbow filed a cross-action against said co-defendants for indemnity. It was because of the possibility that Turnbow might be right in the case so plead that the trial court submitted the Special Issue in answer to which the jury found that $8,500.00 would be a reasonable attorney's fee for the services of Jack Turnbow's attorneys in defending the action brought against him by plaintiffs.

By the time judgment was rendered in the case the trial court had concluded that as a matter of law Turnbow must be held to have failed to establish the case plead by him under the cross-action; that he was not entitled to a judgment of indemnity against his co-defendants. Of course, in view of that decision on the part of the trial court Turnbow could not be entitled to any judgment for attorney's fees, regardless of whether the special issue thereon was a proper issue or whether its manner of submission was proper. With such holding of the trial court we are in accord, and therefore overrule Turnbow's complaint.

Premise for Turnbow's complaint lay in a certain contract with the co-defendants on January 26, 1963. If as a matter of law the construction proper to be given this contract would be that it was unrelated to and did not affect the liability which plaintiffs have successfully imposed upon Turnbow and his co-defendants the relief sought could not be granted. Without reciting the provisions we will state that as a matter of judicial construction the contract merely provided assurance that upon assignment of rights under the original lease by Forest Park Lanes, Ltd. neither it nor Turnbow would be faced with any future contingent liabilities or warranty of any type to the lessee under any sublease. Nothing in the contract has relation to indemnity of Turnbow as applied to the liability which was the subject of the litigation conducted in the trial court.

## TANDY AND PANCAKE HOUSE

Subsequent to the termination of the primary lease Tandy continued to pay $1,-604.00 and Pancake House continued to pay $814.50 per month as rental, said amounts being the contracted amounts owed by them under tenancies by sublease had there been no termination. From the date of termination, under the holding of the

trial court and this court, these parties were occupying the property free and clear of any lease contract. The property was that of the plaintiffs, so each of the parties were legally obligated to make compensation to plaintiffs for their tenancy by way of a discharge of liability for at least the amount of a reasonable rental.

■ The effect of the trial court's judgment was to provide that plaintiffs receive said reasonable monthly rentals during the periods of liability therefor. Such thereof as was in the hands of the defendants was made a part of the damages for which they were obligated to plaintiffs under the judgment; such as were in other hands, specifically in the registry of the court, were directed to be delivered over to plaintiffs. It was plaintiffs' right to receive such amounts and it was defendants' obligation to pay any portions thereof which were to be found in their hands. Defendants had no right to claim any of said amounts of Tandy and the Pancake House for there ceased to be any consideration to support any obligation of such parties to pay rent to defendants after termination of the primary lease. Such termination brought into effect, by operation of law, the termination of all the subleases, validity of which was dependent upon the continuation of the primary lease. We see no necessity to cite authorities.

Pancake House desired to remain on the premises held by it under sublease. It continued to do so up to the time of the judgment and after. Its objective at all times was to keep and operate the portion of the premises it occupied and to maintain friendly relations with both plaintiffs and defendants. It filed an interpleader, but did not seek and was not awarded attorney's fees.

■ In the case of Tandy the case was somewhat different in that the portion of the premises occupied for its operations was so destroyed by the fire in 1967 that it was compelled to cease operations and move. The premises were not repaired so at all material times thereafter the portion of the premises originally taken under Tandy's sublease remained unoccupied. Several months of the rent was paid under the sublease after initiation of plaintiffs' suit, after which there was a Petition in Intervention filed, with the rentals thereafter paid into the registry of the court. Tandy sued for attorney's fees pursuant to its interpleader, which it was of course entitled to collect. 33 Tex.Jur.2d, p. 127, et seq., "Interpleader", Sec. 14, "Costs and fees".

Under the jury's answer to a special issue $2,500.00 was allowed as attorney's fee for Tandy upon its interpleader, and its attorney was paid out of the deposit which had been paid into the registry of the court. It follows, in view of the fact that we have held that it was properly decreed that plaintiffs were entitled to prevail in their case against defendants that they were entitled to recover attorney's fees as part of their damages.

But defendants complain that Tandy's pleadings and evidence do not support an award of attorney's fees in any amount. It appears that up until the time of the fire which inhibited Tandy's occupancy under the sublease Tandy was in the same position as the Pancake House. It wanted to maintain friendly relations with both plaintiffs and defendants. Therefore it did not ask for attorney's fees. However, after the fire it filed an amended petition in interpleader in which it did ask for attorney's fees.

■ Under the decision of Miller v. Nacol, 224 S.W.2d 734 (Fort Worth Tex. Civ.App., 1949, no writ hist.), and other authorities, the appellants contend that since in Tandy's original petition in intervention it contested the right of plaintiffs to have their decree of primary lease termination, Tandy's position was not that of a neutral stakeholder who, upon interpleader, is entitled to attorney's fees. While we might accord validity to the contention

were the state of Tandy's pleadings left in their original state, we do not do so in view of the fact that the original pleadings were completely supplanted by amendment thereof. The complaint would not have validity as applied to the amended pleadings, and it was these upon which the trial was held.

 Complaint is made because the trial court permitted a withdrawal of the rental monies paid by Tandy and the Pancake House from the registry of the court, after judgment and while appeals pended. No appellant filed a supersedeas bond. It was upon expiration of the time within which such might have been filed that the court permitted the withdrawal. Under the judgment of the trial court, in the proper exercise of the jurisdiction therein obtaining, the plaintiffs were entitled to receive the "stakeholder" money absent any supersedeas of judgment by them. In view of this court's holding on the more material legal questions defendants were not harmed in any event.

' We believe that in our discussion the material issues of the case are fully covered, with the holdings of the court thereon indicated. In any event all the points of error of complainants have been severally considered and are overruled except where we have specifically sustained them. The points sustained were those as result of which we have held certain awards in damages, totalling $24,183.91, to have been erroneously granted as a part of the whole of the damage award of plaintiffs against defendants.

Accordingly and except as it obtains against Forest Park Lanes, Inc., which did not appeal, the judgment is reformed so that the relief granted in the form of damages is reduced from the total amount of $187,419.18 (as indicated to be the total awarded by the trial court) to the amount of $163,235.27. In all other respects the trial court's judgment is affirmed. Costs of the appeal shall be divided so that plaintiffs shall be responsible for the payment of one-half thereof, and the defendants,

Forest Park Lanes, Ltd., Aaron Rashti, George Rashti, and Jack Turnbow shall be responsible for the payment of one-half thereof as joint and several obligors. Liability for costs below shall be as decreed in the trial court's judgment.